Charles C. PHILLIPS, Appellant,

v.

STATE of Alaska, Appellee.

No. 4877.

Supreme Court of Alaska.

Nov. 28, 1980.

Sue Ellen Tatter, Asst. Public Defender, Brian C. Shortell, Public Defender, Anchorage, for appellant.

W. H. Hawley, Jr., Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BURKE, Justice.

Charles Phillips, a sixty-seven year old Athabascan Indian with a long history of alcohol abuse, was convicted of manslaughter for the killing of George Chilligan. The killing occurred after a night of drinking in a cabin in Eklutna, near Anchorage. Phillips shared the cabin with Mike and Andy Yakasoff. Phillips was sentenced to a ten year term of imprisonment. The sentencing judge recommended that he be incarcerated at a "minimum security facility appropriate to [his] age and physical condition." He has appealed both his conviction and sentence.

At about 4:40 a. m. on July 27, 1978, State Trooper James Little arrived in Eklutna to investigate a telephone report that someone had discovered a dead body. He was met at the highway turnoff by Mike Yakasoff. Yakasoff took Officer Little to his cabin, in which Little observed a body on the floor, with blood around it. Little asked the cabin's occupants, the Yakasoff brothers and Phillips, to leave, which they did. Little testified at a suppression hearing that the Yakasoffs and Phillips had been drinking, but were "very responsive," and not "befuddled or incoherent."

In response to Little's summons, Trooper Sergeant Alfred Pacheco, Little's supervisor, arrived at the scene. Pacheco and Little went back into the cabin. The two officers made further brief observations of the body and its surroundings, and conclud-

ed that death had resulted from natural causes, possibly bleeding ulcers.

A few minutes later, while the officers were outside waiting for the body to be removed, Andy Yakasoff mentioned that he thought he saw a knife. Little and Pacheco then re-entered the cabin and made a closer examination of the body, discovering a puncture wound in the chest. They summoned other criminal investigators, who arrived one at a time, the first around 6:00 a. m. The investigators remained at the scene for about five hours and seized numerous items of physical evidence. No search warrant was ever obtained.

By 11:00 a. m., the investigators had decided that Phillips was the prime suspect. One of them again spoke to Phillips,[1] who, after being properly advised of his rights, confessed to the homicide. Phillips was subsequently indicted for manslaughter.

Prior to trial, Phillips moved to suppress the evidence discovered during the search of the cabin. He implicitly conceded the validity of Little's initial entry and of the second entry by Little and Pacheco, under the "emergency aid" exception to the warrant requirement.[2] He argued, however, that the third entry which Little and Pacheco made, after the knife was mentioned, and the subsequent entries by the investigators, all fell outside the exception, as it was by then clear to the police that an emergency no longer existed. The state responded that the "emergency aid" exception justified all of the warrantless entries and searches. After an evidentiary hearing, Superior Court Judge Ralph E. Moody denied

Phillips' motion. He ruled not on the basis of the "emergency aid" exception, but upon the ground that Mike Yakasoff validly consented to Officer Little's initial entry, and that this consent carried over to the subsequent entries as well.[3]

### A.   Search and Seizure.

■   Judge Moody's ruling on the validity of the search requires us to examine only two points: (1) whether Yakasoff validly consented to Little's initial entry, and (2) whether, if the initial consent was valid, that consent was ongoing and applicable to the subsequent entries.[4]

We have held that the state has the burden of demonstrating the validity of a consent, and that consent is not to be inferred lightly: it must be shown to be unequivocal, specific and intelligently given, and not the product of duress or coercion. *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973). But there are no magic words without which a valid consent cannot be found; rather, "[d]etermination of the requisite voluntariness of the disputed consent is a question of fact to be determined from all the circumstances." *Gray v. State*, 596 P.2d 1154, 1158 n.18 (Alaska 1979). In this case, we conclude that Mike Yakasoff voluntarily consented to the entry. Someone in the cabin, presumably he or his brother, summoned the police to the scene. Mike Yakasoff met Little when he arrived a short time later and directed him to the cabin, and there is no evidence suggesting that Yakasoff's actions were not voluntary.[5]

---

1. Phillips had been first questioned around 9:10 a. m. as part of the general investigation of the homicide. He was not advised of his rights at that time, because the questioning was not custodial and the investigation had not yet focused on him. This preliminary questioning produced no incriminating statements.

2. *Stevens v. State*, 443 P.2d 600 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969).

3. The parties stipulated that at no time after the knife was mentioned did the police ask for anyone's consent to their later entries.

4. Our holding makes it unnecessary for us to consider whether the search was one coming within the "emergency aid" exception.

5. We can quickly dispose of two contentions raised by Phillips. He first claims that the state failed to prove that any occupant of the cabin was sufficiently sober to give valid consent. But viewing the evidence in the light most favorable to the state, which we are required to do since the state prevailed below, *Gray v. State*, 596 P.2d 1154, 1158 n.18, we reject this claim. As noted, Little testified that the cabin's occupants were responsive, and not incoherent. Moreover, we believe that anyone able to summon the police and lead them to the

▆ We further conclude that Mike Yakasoff's initial consent extended to the subsequent entries and the investigators' thorough and probing search. The continuing nature of Mike Yakasoff's consent was shown by his failure to object to the re-entry of the police, after his brother mentioned the knife, and to the ensuing stepped up investigation by Little, Pacheco and the investigators.[6] An *initial* consent cannot be inferred from lack of objection. *Robinson v. State*, 578 P.2d 141, 143–44 (Alaska 1978). But that is not the question here. Rather, it is whether lack of objection to subsequent, closely related entries and searches, after valid consent to an initial entry, can imply that the initial consent continued. We hold that it can. Mike Yakasoff evidently consented to Little's initial entry in order to have the mystery of the dead body resolved. The subsequent entries and the investigative search were all made for the same purpose. While it might have been prudent for the police to have obtained a specific consent to each new intrusion, we cannot say that their failure to do so vitiated Mike Yakasoff's implied continuing consent.

There is relatively little authority on this question [7] but what authority there is supports our view. In *Knight v. State*, 276 So.2d 624 (Ala.Cr.App.), *cert. denied*, 276 So.2d 628 (Ala.1973), the police responded to the defendant's request that they come investigate the murder of his wife. Several hours after the initial entry a police toxicologist arrived. The toxicologist had no warrant nor did he ask for permission to enter, but the defendant did not object to his entry. An extensive and intrusive investigation by the toxicologist turned up evidence used against the defendant. The Alabama court upheld the admission of this evidence, holding that "[n]o renewed authority documented by a search warrant" was a prerequisite to the toxicologist's entry in light of Knight's earlier summoning of the police. *Id.* at 627. *Knight* relied on *State v. Oakes*, 276 A.2d 18, 23–26 (Vt. 1971), *cert. denied*, 404 U.S. 965, 92 S.Ct. 340, 30 L.Ed.2d 285, which reached the same result on approximately the same facts.[8] Neither case, however, rests purely on the consent rationale; both rely in part on the murder investigation exception disapproved in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).[9]

cabin was also legally able to validly consent to the police entry.

Phillips' second claim is that the state failed to show that Mike Yakasoff had authority to legally consent to Little's entry into the cabin. He apparently concedes that Mike Yakasoff lived there, but faults the state because it "adduced no evidence showing what type of relationship Mike Yakasoff had to the cabin. The cabin may have been maintained largely by Andy Yakasoff, who let the others stay there when he felt like it." But, in *Robinson v. State*, 578 P.2d 141, 144–45 (Alaska 1978), we clearly implied that a person with "joint access to, or control of" a place is authorized to consent to entry. Mike Yakasoff had this access or control, no matter what his "type of relationship . . . to the cabin" was.

**6.** In support of Judge Moody's consent theory, the state also relies upon Andy Yakasoff's remark about the knife, which caused the police to re-enter the cabin and intensify their investigation. This remark might well be construed as a new consent by Andy Yakasoff, but we find it unnecessary to resolve this question.

**7.** There is little authority because courts have apparently found it unnecessary to examine the question. Instead, in cases of this type they

have relied on a general "death scene investigation" exception to the warrant requirement. *See* 2 W. LaFave, Search and Seizure § 6.5(e) (1978). Thus, for instance, in *State v. Chapman*, 250 A.2d 203 (Me.1969), the court did not even decide the consent issue presented, as it found an extensive warrantless search was justified as incident to the disclosure of an apparently violent death. But, this death scene exception was rejected by the United States Supreme Court in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). None of the post. *Mincey* cases discussed in LaFave's treatise have involved consensual entries like the one here.

**8.** In *Oakes*, the defendant had been taken into custody, because of his erratic behavior, prior to the second entry, six hours after the first; he therefore was unable to voice opposition to the second entry even if he had wanted to. But the investigation in *Oakes* was also less intrusive than that in *Knight*, consisting primarily of the taking of photographs and measurements.

**9.** See note 5, *supra*. In the post *Mincey* case of *Hubbard v. State*, 382 So.2d 577, 591–92 (Ala. Cr.App.1979), *aff'd*, 382 So.2d 597 (Ala.1980),

**B. Sentence.**

█ In claiming that his ten year sentence is excessive, Phillips contends that Judge J. Justin Ripley, the judge that imposed sentence, overemphasized the need for deterrence and community condemnation, and that he gave too little weight to the other factors set forth in *Chaney v. State*, 477 P.2d 441, 444 (Alaska 1970).[10] He recognizes that we have upheld other ten year sentences for alcohol-related manslaughter convictions: *Alpiak v. State*, 581 P.2d 664 (Alaska 1978), and *Halverson v. State*, 573 P.2d 1380 (Alaska 1978), but claims that these cases are distinguishable, because of his age and his chronic alcoholism. He argues that he is entitled to probation and a long period of closely supervised residence at the Studio Club, an alcohol rehabilitation center in Anchorage.[11]

We are not convinced that Judge Ripley's ten year sentence was clearly mistaken.[12] Phillips has an extensive criminal record, including one prior homicide conviction.[13] His offense was obviously among the most serious, one which society condemns strongly and which others must be deterred from committing.[14]

Phillips' conviction and sentence are AFFIRMED.

the court found valid consent where the defendant had been drinking but was not drunk, and voluntarily gave keys to the house where the homicide occurred to investigating officers "and never once protested the search." *Id.* at 592.

**10.** In *Chaney* we said:
Under Alaska's Constitution, the principles of reformation and necessity of protecting the public constitute the touchstones of penal administration. Multiple goals are encompassed within these broad constitutional standards. Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves.
477 P.2d at 444 (footnotes omitted).

**11.** At the time of sentencing, in July, 1979, Phillips had been at the Studio Club for about one year; he had apparently been sent there shortly after his arrest. The Studio Club director testified that he was doing well. To the best of our knowledge, Phillips is still at the Club pending resolution of his appeal.

**12.** *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

**13.** Phillips was convicted of second-degree murder in Anchorage in 1949. He received a 25 year sentence for this alcohol-related homicide, and served about 15 years of the sentence. Most of his other convictions were for petty offenses, again mostly alcohol-related.

**14.** In *State v. Abraham*, 566 P.2d 267 (Alaska 1977), we disapproved as too lenient a five year sentence for manslaughter, with four years suspended, resulting from Abraham's fatal beating of his wife while in a drunken rage. Abraham was somewhat similar to Phillips; he was a fifty-eight year old Eskimo from southwest Alaska, who spoke only Yupik, and had a history of alcohol-related violence. We stated, "Granted Mickey Abraham is somewhat advanced in years and probably will have difficulty adjusting to prison life, nevertheless, members of his family, as well as society in general, are entitled to the full protection of Alaska's laws." *Id.* at 272 (footnote omitted). Comparing Phillips to Abraham, we note that this was Phillips' second homicide, and that the killing here was carried out with a dangerous weapon. We believe that Judge Ripley properly accounted for Phillips' age and condition with his recommendation that Phillips serve his sentence in a minimum security institution. The judge also recognized that certain of the *Chaney* objectives, such as isolation of the defendant to protect the public, could be best served by placing Phillips at the Studio Club, but a sentencing judge has broad discretion in according different weights to the various factors to be considered in sentencing. *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973).