**Frank PIERCE, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4875.**

Court of Appeals of Alaska.

April 23, 1981.

---

Rhonda F. Butterfield, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

COATS, Judge.

Frank Pierce has appealed to this court from his convictions for armed robbery, burglary in a dwelling, burglary not in a dwelling, carrying a concealed weapon, and receiving or concealing stolen property.[1] All of these convictions arose out of an armed robbery at the Alyeska Lodge on April 3, 1978.

### STATEMENT OF FACTS

At 12:30 a. m. on Monday, April 3, 1978, Chris Von Imhof, manager of Alyeska Resort, was awakened at his residence by two men armed with hand guns who ordered him onto his stomach and tied him to his bed. Von Imhof was forced to explain the layout of Alyeska, its safes, and its alarm system. One man remained at the Von Imhof home with Von Imhof, his wife, brother-in-law, and six-year-old son. The other man went to the lodge.

After several hours, Von Imhof heard a car come racing down from the lodge site. Von Imhof heard a commotion and the armed man left the house. Von Imhof went to the lodge and discovered that the safe had been broken into. The safe was empty except for dust from its insulation material.

Paul Aubert, the night auditor at Alyeska Resort, testified that he was grabbed from behind while working at the front desk. A man said, "This is a robbery," questioned him about the alarm system, and told him there was a man holding Von Imhof and his family hostage. The man took Aubert to an empty hotel room and wired his feet to the bedframe. He revisited Aubert several

Sue Ellen Tatter, Dana Fabe, Asst. Public Defenders, and Brian Shortell, Public Defender, Anchorage, for appellant.

---

1. Pierce was sentenced to eleven years for armed robbery; eleven years concurrent with the armed robbery sentence for burglary in a dwelling; three years concurrent for burglary not in a dwelling; thirty days concurrent for carrying a concealed weapon; and one and one-half years concurrent for receiving or concealing stolen property. The judgment and order of probation lists the latter charge as burglary not in a dwelling but this is a clerical error.

times to ask questions. Finally Aubert managed to get free and called the police.

State Trooper William Hughes responded to the call. When he arrived at the Alyeska resort he observed signs of forcible entry, and was advised that the robbers might be in the area. Trooper Hughes saw a vehicle leaving the area at a high rate of speed. He could not see the vehicle well enough to get a description. By the time he reached his patrol car the vehicle was out of sight, but he gave chase hoping to catch up with it. He stopped a pickup, but it did not appear to be the one he had seen leaving. He continued down the road for a few minutes, but then returned to Alyeska and obtained a description of the robbers from the Von Imhofs. They described one of the men as tall, the other shorter. One had on a dark coat, possibly black. One had on brown pants. Both had black ski masks. Hughes observed that the office door at the lodge had been kicked in, leaving the footprint of a large tennis shoe. He learned from the Von Imhofs that the robber who remained at their place had told them that something had gone wrong and his partner had left without him. The robber then ran out the door and disappeared. Hughes therefore believed one of the robbers was on foot.

At about 8:15 that morning Hughes received a dispatch regarding a subject on the roadway near Bird Creek, north of Alyeska. Hughes headed north toward Bird Creek. While on the highway to Bird Creek he contacted another trooper who had been traveling south on the highway. That trooper indicated he hadn't seen anyone on the road. Hughes continued to the Bird Creek Restaurant to see if anyone there had seen someone. A person at the Bird Creek gas station told Hughes he had not seen anyone hitchhiking or on foot in the area. Hughes then decided to head back toward Alyeska. He again observed the other trooper, now returning north. That trooper signaled Hughes that he still hadn't seen anyone on the road. While heading south, returning toward Alyeska, Hughes saw someone on the roadway walking north. As Hughes neared the pedestrian he saw that he was wearing a black coat, brown pants, tennis shoes, and a black knit cap which appeared to be the kind which could be used as a ski mask. He was carrying a backpack. Hughes stopped the pedestrian and asked him to identify himself. The pedestrian pulled out a wallet that contained a driver's license identifying him as Frank Pierce. Trooper Hughes explained about the robbery and told Pierce the troopers were stopping people in the area who matched the description of the robbers. The trooper told Pierce that he was going to conduct a pat down search of him. Pierce did not object. When Hughes patted down Pierce's coat pocket he found a short-barrel .38 handgun. Hughes asked Pierce to place his backpack on the back seat of the car. Pierce did, and then got into the front seat. Hughes advised him of his rights, then asked him if he understood them. Pierce said nothing. Hughes began to read the rights again and Pierce then said that he understood them. Pierce told Hughes that he had found the .38 along the roadway and had been walking all night from Anchorage. Hughes explained to Pierce that while he could levy charges against him for carrying a concealed weapon, he was more interested in questioning him with regard to the robbery. He asked Pierce what he had in his backpack, and Pierce replied, "dirty clothes." Hughes did not inspect the backpack, but drove it and Pierce to Alyeska.

Hughes and Pierce were met at Alyeska by Investigator Sam Barnard. Von Imhof, who was present, recognized Pierce as a carpet layer who had worked for Alyeska previously in both the hotel and the office.

Barnard asked Pierce if he had been advised of his rights, and Pierce indicated that he had. Barnard explained that a robbery had occurred and that he was looking for evidence involved in the crime, including clothing that might have been worn by the robbers and/or large sums of money. He asked Pierce if he could search his backpack. Barnard informed Pierce that he had a right to refuse to let them search the backpack. Pierce said that he understood,

and let the troopers search the pack. Inside they found a smaller backpack full of money, keys, and deposit envelopes which Chris Von Imhof recognized as being from Alyeska. All the money was accounted for. Barnard then took Pierce into the lodge for a taped interview. He thought that although Pierce appeared tired, he was coherent and did not appear to be under the influence of any drugs or alcohol.

During the interview, Pierce indicated that he understood he had a constitutional right to remain silent. Pierce said that he didn't know what to do, and one of the troopers advised him to make a statement so that they could determine if he had in fact found the money. Pierce said he didn't know if he should say so or not. The questioning continued as follows:

Q. So, due to the situation you feel like you maybe would rather not answer questions?

A. No. See, a little while ago I had an officer come to the door and give me a warrant for somebody else's house, and she wanted to search the house, and I told her that I wanted to call my attorney to see if it was right for her to search the house.

Q. Umhuh (affirmative).

A. And she had her foot on the threshold of the house, and I asked her to move her foot, please, and asked her, you know, told her that I was going to close the door and call an attorney and see if it was legal for her to search, so she could search, and then I got an assault and battery charge for grabbin' her by the shoulders and throwin' her out of the house, and I didn't even touch her.

Q. Well, I can understand . . .

A. See, I don't know what I'm sayin'.

Q. Okay.

A. I don't know if I should say anything or not.

Q. I can understand your concern about the other offense, and of course I

don't, I'm not asking you about, anything about the assault and battery, or the alleged assault and battery, what we're mainly concerned with here is this large sum of money and this pistol which you have in your possession, and that's the only thing I want to ask you about, is simply whether or not you're telling us the truth when you said that you found it [sic] along the road.

A. That's where they were.

Pierce answered a series of questions about where he had found the money, then stopped talking. Investigator Barnard questioned him again at the Trooper Detachment in Anchorage, but Pierce stated only that "I need to find somebody to tell me what to do." The trooper asked, "You mean like an attorney?" and Pierce responded, "Someone that's smarter than I am." Barnard continued to speak, but Pierce answered no questions. Pierce was charged with receiving or concealing stolen property and was subsequently charged with burglary in a dwelling, burglary not in a dwelling, armed robbery, and carrying a concealed weapon. He was convicted on all counts in a jury trial.

## THE INVESTIGATIVE STOP

Pierce contends that there was not enough evidence for Trooper Hughes to stop him along the highway. The state argues that stopping Pierce was authorized as an investigative stop under *Coleman v. State*, 553 P.2d 40, 43 (Alaska 1976). In *Coleman* the Supreme Court of Alaska held that:

[A] police officer with a reasonable suspicion that imminent public danger exists or serious harm that has recently occurred was caused by a particular person may stop that person.[2]

Applying this standard to this case we find it was reasonable for Trooper Hughes to stop Pierce. An armed robbery had occurred a few hours before the stop.

2. This language is quoted with approval in *Ebona v. State*, 577 P.2d 698, 700 (Alaska 1978).

*See also Ozenna v. State*, 619 P.2d 477 (Alaska 1980).

One of the robbers was probably on foot. From Trooper Hughes' trips up and down the highway and the information gained from the other trooper, he knew Pierce was the only pedestrian in the area. Pierce's sudden appearance in the area was suspicious. Pierce also matched the description of the robbers that Trooper Hughes obtained from the Von Imhofs.

 Once Trooper Hughes stopped Pierce, it was reasonable for him to conduct a pat down search for weapons in order to protect himself. There had been an armed robbery and if Pierce were one of the robbers, it was reasonable to suspect he would still be armed. After Hughes found the pistol as part of the pat down search, he had probable cause to arrest Pierce for carrying a concealed weapon and could take him into custody.[3]

## THE SEARCH OF THE BACKPACK

Pierce argues that the search of his backpack was improper. The state contends that the search of the backpack was authorized because Pierce consented to the search. The Supreme Court of Alaska recently discussed consent searches in *Phillips v. State*, 625 P.2d 816 (Alaska 1980). In that case the court said:

> We have held that the state has the burden of demonstrating the validity of a consent, and that consent is not to be inferred lightly: it must be shown to be unequivocal, specific and intelligently given, and not the product of duress or coercion. But there are no magic words without which a valid consent cannot be found; rather, "[d]etermination of the requisite voluntariness of the disputed consent is a question of fact to be determined from all the circumstances." (citations omitted).[4]

 Since the court denied Pierce's motion to suppress below, we view the evidence given at the suppression hearing in the light most favorable to the state. *Gray v. State*, 596 P.2d 1154, 1158 n.18 (Alaska 1979). We hold that under the circumstances of this case there was sufficient evidence for the trial court to conclude that Pierce voluntarily consented to the troopers searching the backpack.

## THE *MIRANDA* WARNING

Pierce argues that the statement which he made to Investigator Barnard after Trooper Hughes transported Pierce to Alyeska should have been suppressed by the trial court. Pierce argues that he was not given a proper *Miranda*[5] warning and that his responses indicate he did not voluntarily waive his right to remain silent.

 The state has conceded that Pierce was in custody after Trooper Hughes found the pistol during the pat down search. It was therefore necessary for Trooper

---

3. The facts in this case are similar to the facts in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry* the police officer had reasonable grounds to believe the two people he was watching were about to commit a robbery. The officer approached the people to question them. He did a pat down search of both people and found a weapon on the defendant John Terry. The court upheld an arrest and conviction of Terry for carrying a concealed weapon, saying:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

*Id.* at 30–31, 88 S.Ct. at 1884–1885, 20 L.Ed.2d at 911.

4. The quoted language in *Phillips* is from *Gray v. State*, 596 P.2d 1154, 1158 n.18 (Alaska 1979).

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Hughes to give Pierce a *Miranda* warning. *Hunter v. State*, 590 P.2d 888 (Alaska 1979); *McMahan v. State*, 617 P.2d 494 (Alaska 1980).

■ Trooper Hughes testified he advised Pierce of his *Miranda* rights and that he was "almost positive" he did so by reading from a *Miranda* card.[6] Pierce did not respond when Hughes asked him if he understood his rights, so Hughes began to read again from the card. Pierce then told Hughes he understood his rights. Hughes took Pierce to Alyeska where Investigator Barnard took over the investigation. Investigator Barnard testified that Pierce confirmed he had been warned of his rights by Trooper Hughes and that he understood his rights. We find that the record supports the trial court's finding that Pierce was adequately advised of his *Miranda* rights.

## THE VOLUNTARINESS OF PIERCE'S WAIVER OF RIGHTS

■ Pierce claims that there was not sufficient evidence for the trial court to decide that he voluntarily waived is *Miranda* rights. The test for determining if a person has waived his *Miranda* rights was discussed recently by the supreme court in *McMahan v. State*, 617 P.2d 494, at 498 (Alaska 1980), where the court said:

> The state's burden of showing that a confession was voluntary and that the defendant had waived his *Miranda* rights can be made by a preponderance of the evidence. In determining voluntariness, the court must look to the totality of the circumstances surrounding the defendant's statements (citations omitted).

In the case before us Pierce was warned of his rights and indicated that he understood them. He then made several statements to Trooper Hughes suggesting that he found the money and gun along the road and that he had walked from Anchorage.

Shortly thereafter he was reminded of his rights by Investigator Barnard and indicated that he understood his rights. Pierce did say that he was not sure whether he should exercise his rights or not. However, when Investigator Barnard asked, "So, due to the situation you feel like you maybe would rather not answer questions?", Pierce said "no" and continued to talk freely. At another point in the interview the officers told Pierce that they would stop asking questions at any time. We hold that the record supports a finding that Pierce voluntarily waived his rights.[7]

## THE EVIDENCE FROM PIERCE'S SHIRTS

■ A key part of the evidence against Frank Pierce at trial was that clothes recovered from his van had insulation material on them which was similar to insulation material from the safe which had been broken into in the Alyeska robbery. The state argues that Pierce's shirts were turned over to the troopers voluntarily by a friend of Pierce's named Tracy Hupp. Pierce contends that this evidence should have been suppressed because his shirts were illegally seized, arguing that Hupp did not consent to turn over his shirts to the troopers.

Following Pierce's arrest his sister, Grace Pierce, and her roommate, Tracy Hupp, traveled to Bird Creek to retrieve Pierce's van. The van was stuck on a side road and was not visible from the highway. The van was freed and driven to Anchorage and parked near a building where Grace Pierce and Hupp had an apartment.

The next day Investigator James Jarrett and Trooper Lyle Haugsven of the Alaska State Troopers went to Grace Pierce's apartment to speak with her. The troopers discovered the van and met Grace Pierce and Tracy Hupp.

The testimony of the troopers about how they obtained the shirt was in direct con-

6. A *Miranda* card is a wallet-sized card with the *Miranda* warnings printed on it.

7. The Supreme Court of Alaska has held that a police officer does not have to cease question-

ing when faced with an ambiguous comment. *Vail v. State*, 599 P.2d 1371, 1378–79 (Alaska 1979).

flict with the testimony of Grace Pierce and Hupp. Investigator Jarrett testified that he was invited into the apartment by Hupp. He testified he explained to Hupp and Grace Pierce that he was investigating a robbery. He said Hupp told him that she had taken some of Pierce's clothes out of the van and washed them at Pierce's request. Hupp asked to call an uncle who was a customs agent and was allowed to do so. According to Trooper Jarrett, at some point Hupp came forward and gave Pierce's shirts to Investigator Haugsven. Investigator Jarrett said he never threatened Hupp at any time. After this, Hupp's uncle came over and talked to her privately; Hupp then signed a form which authorized the troopers to search. Grace Pierce also signed a similar form. After the waiver of search form was signed, the troopers searched the apartment but did not discover any additional evidence. Trooper Haugsven's testimony was basically the same as Investigator Jarrett's.

Grace Pierce testified that she did not invite the troopers into the apartment, that she asked for an attorney, and that she asked the troopers to leave. They did not leave, and she said she signed the waiver of search only because she felt the troopers were going to search anyway.

Hupp testified that she didn't know if Grace Pierce asked the troopers to leave,

but that she herself was threatened with arrest by the troopers. She said she handed Frank Pierce's shirts to the troopers, and that she signed the waiver of search because she felt the troopers were going to search anyway.

The trial court resolved this conflict in the testimony by ruling that the shirts were turned over to the troopers voluntarily.[8] Earlier in this opinion we discussed the standards which should be applied to a consent search. We have examined the record viewing the evidence in the light most favorable to the state, and conclude that there was sufficient evidence for the trial court to find there was a valid consent based on the totality of the circumstances. *Phillips v. State*, 625 P.2d 816 (Alaska 1980).[9]

## THE CONVICTION FOR RECEIVING OR CONCEALING STOLEN PROPERTY

Pierce was convicted of both armed robbery and receiving or concealing stolen property.[10] He argues that he should not have been convicted of both charges. Pierce raised this issue for the first time in a new trial motion after his conviction. However, we have decided to reach this issue as plain error.[11]

---

**8.** "Resolution in conflicts of testimony at the suppression hearing are left to the trial judge." *Frink v. State*, 597 P.2d 154, 167 (Alaska 1979).

**9.** The supreme court in *Gray v. State*, 596 P.2d at 1158 n. 18, discussed the standard which we apply in reviewing the decision of a trial court where the trial court has refused to suppress evidence:

Determination of the requisite voluntariness of the disputed consent is a question of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Sleziak v. State*, 454 P.2d 252 (Alaska 1969). On appeal from the trial court's denial of a suppression motion, the evidence taken at the hearing is viewed in the light most favorable to the state. *Anthony v. State*, 521 P.2d 486, 492 (Alaska 1974). The person giving the consent need not be advised of the right to refuse to allow a search prior to executing a valid consent to search, although

the subject's awareness of the right to refuse is a factor in the determination of the voluntariness of the consent. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047, 36 L.Ed.2d at 863, and *Sleziak*, 454 P.2d at 259.

**10.** Former AS 11.20.350 read as follows:

A person who buys, receives, or conceals money, goods, bank notes, or other thing which may be the subject of larceny and which has been taken, embezzled, or stolen from another person, knowing it to have been taken, embezzled, or stolen, is punishable by a fine of not more than $1,000 and by imprisonment for not less than one year nor more than three years.

**11.** Criminal Rule 47(b) reads as follows:

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

A number of jurisdictions have held that a thief [12] cannot be convicted both of receiving or concealing stolen property and of stealing the same property.[13] This result is reached by statutory interpretation. Courts have reasoned that the purpose of the legislature in passing receiving or concealing stolen property statutes is to punish a person who helps a thief dispose of property, and not to further punish the thief by compounding his theft crime.

However, it does not follow that a thief cannot be convicted of receiving or concealing stolen property if he stole but is not convicted of stealing the property. In *Hayes v. State*, 581 P.2d 221 (Alaska 1978), the defendant argued that, since the evidence tended to show that he stole the property, he could not be convicted of receiving or concealing stolen property. The supreme court rejected that argument and held that a person could be convicted of receiving or concealing stolen property even though the proof tended to show he was the thief.[14] This holding reflects the practical reality that it would make little sense to allow a person to escape a charge of receiving or concealing stolen property by allowing him to prove that he is the thief. However, *Hayes* does not answer the question of whether a person may be convicted both of receiving or concealing stolen property and of stealing the same property.

The state has not cited us to any cases in which a person was convicted of both receiving or concealing stolen property and stealing the same property. The cases of which we are aware do not allow a conviction for both offenses, at least where the defendant was convicted for stealing the property himself,[15] as opposed to being convicted as an accessory.[16] In addition, there is the principle of statutory construction that penal statutes should be strictly construed against the government.[17] We conclude as a matter of statutory interpretation that under the facts of this case it was improper for the court to enter convictions against Pierce for both receiving or concealing stolen property and armed robbery.[18]

Pierce argues that the court should order a new trial in the event we

---

12. Robbery is an aggravated form of larceny. Larceny is commonly referred to as theft; robbery is theft with two added elements. First, to constitute robbery the stolen property must be taken from the victim's person or from his presence. Second, the taking of the property must be by force or violence. Under former AS 11.15.240 and AS 11.15.295, an additional aggravating factor is added when the person committing the robbery uses a firearm. W. LaFave & A. Scott, *Criminal Law* § 94 at 692–704 (1972) (hereinafter referred to as "LaFave & Scott")].

13. *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); *Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). *See also* 2 F. Wharton, *Wharton's Criminal Law and Procedure* § 576 at 296 (12th ed. 1957); LaFave & Scott, *supra* § 93 at 689–690.

14. The supreme court in *Hayes* pointed out there are two lines of authority on this point. *People v. Daghita*, 301 N.Y. 223, 93 N.E.2d 649 (1950) is representative of the cases which hold that a person cannot be convicted of receiving or concealing stolen property if the evidence shows he was the thief. *Walls v. State*, 491 P.2d 320 (Okl.Cr.1971); *State v. Carlton*, 378 P.2d 557, 233 Or. 296 (1963); and *State v. Carden*, 50 Wash.2d 15, 308 P.2d 675 (1957) are representative of cases where courts held that

a person can be convicted of receiving or concealing stolen property when the evidence tends to show the defendant was the actual thief.

15. *Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961); *People v. Jaramillo*, 16 Cal.3d 752, 129 Cal.Rptr. 306, 548 P.2d 706 (1976).

16. *State v. Botta*, 27 Ohio St.2d 196, 271 N.E.2d 776 (1971).

17. 3 C. Sands, Sutherland Statutory Construction § 59.03 at 6–7 (4th ed. 1974).

18. In this case the state's major theory was that Frank Pierce was one of the people who actually committed the robbery and that he was apprehended shortly after the robbery attempting to abscond with the proceeds. We therefore do not need to decide if it would be permissible to convict a person both for a theft offense as an aider and abettor and for receiving or concealing the same stolen property. *Cf. Milanovich v. United States*, 365 U.S. at 556–562, 81 S.Ct. at 730–733, 5 L.Ed.2d at 777–780 (dissenting opinion of Justice Frankfurter); *State v. Botta*, 27 Ohio St.2d 196, 271 N.E.2d 776 (1971); LaFave & Scott, *supra*, § 93 at 689–90.

conclude he should not have been convicted of both armed robbery and receiving or concealing stolen property. *See Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961); *People v. Jaramillo,* 16 Cal.3d 752, 129 Cal.Rptr. 306, 548 P.2d 706 (1976). We reject this argument. As we pointed out earlier, this issue was only raised as a new trial motion after conviction. Pierce did not demonstrate to the trial court how he would be prejudiced by having both charges go to the jury. On the facts of this case we conclude it was a sensible procedure to send both charges to the jury.[19] We find no error and therefore hold that a new trial is not required. However, Pierce's conviction for receiving or concealing stolen property should be vacated.[20]

This case is remanded to the superior court for an order to vacate the conviction and sentence for the charge of receiving or concealing stolen property. In all other respects the judgment is AFFIRMED.

---

**19.** *See State v. Botta,* 27 Ohio St.2d 196, 271 N.E.2d at 782.

**20.** Our decision on the charge of receiving or concealing stolen property makes it unnecessary for us to decide whether the charge of receiving or concealing stolen property was properly consolidated with the other charges, since the main prejudice which Pierce alleged was that he wished to testify on the receiving or concealing stolen property charge. *Cf. Cleveland v. State,* 538 P.2d 1006 (Alaska 1975). Since we vacate Pierce's conviction for receiving or concealing stolen property, it is clear his failure to testify on these charges was not prejudicial to him in any way.