Charles L. BROWN, Appellant,

v.

STATE of Alaska, Appellee.

No. 7358.

Court of Appeals of Alaska.

June 15, 1984.

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Richard W. Maki, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Charles Brown entered a no contest plea to an indictment charging him with theft by receiving in the second degree, a class C felony. AS 11.46.130(a)(1); AS 11.46.-190(a). He appeals under reservation of right in conformity with *Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978), and *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974). We therefore have jurisdiction over this appeal.

Brown contends that the trial court erred in denying his motion to suppress evidence seized from his person and from his hotel room. We affirm.

## STATEMENT OF FACTS

In March of 1982, Officer Stevens of the Anchorage Police Department went to the

Inlet Inn to investigate a "voucher fraud." Apparently, people were using vouchers with false names to pay for rooms. As Stevens was talking with hotel administrators, he saw Charles Brown carrying a portable television set. Stevens said he thought it was "kind of interesting" that a person would have a portable television in a hotel that already had a television in each room.

Stevens asked Brown if the television belonged to him, and Brown replied that it was not his. Stevens asked Brown where it came from, and Brown replied that a man he did not know gave it to him. Stevens asked for a description of this person. Brown said he had gotten the television from a white man in room 122. The officer then asked Brown for identification, and Brown said he did not have any. Stevens proceeded to frisk Brown "because of the answers of the questions that he gave me didn't relieve ... [me]—of fear."

Brown originally stated that his name was James Black. When the officer conducted the pat-down search he discovered a wallet. He asked Brown to pull out the wallet and show some identification. As Brown was flipping through it, Stevens noticed a social security card with the name "Charles Brown" on it. At first Brown claimed that Charles Brown was his brother's name, but when the officer pointed out that it is unusual for brothers to have different last names, the defendant admitted that he was Charles Brown.

Stevens asked for picture identification, which Brown said he did not have. Stevens then asked Brown how he had paid for his room. Stevens had noticed the names "James Black" and "Charles Brown" on his list of voucher frauds. Brown replied that he had bought his voucher for $25 for seven nights from a man possibly named "Mike" staying in room 122.

Stevens then asked Brown where he was staying and Brown replied that he was staying in room 8, but that his clothes were in room 122. Stevens said, "Well, let's go to room 8." Stevens testified that he made the suggestion because he wanted to see if

Brown had a key to room 8. Stevens also testified that he wanted to verify Brown's identity, and to obtain further information about the television. Brown walked up to the door of room 8 with Stevens right behind him. Brown opened the door and Stevens followed him into the room.

Stevens noticed computer equipment stacked on the floor. He testified that he thought it was odd for a person with expensive appearing computer equipment to be using a cheap voucher to stay in a hotel. The fact that Officer Stevens had come across some computer equipment was relayed to Anchorage Police Officer Kasper, who was investigating a nearby burglary involving a theft of computer equipment. Stevens and Brown were standing in the hallway outside room 8 when Officer Kasper arrived. Kasper asked where the equipment was. Brown produced a key, opened the door to room 8 and motioned for him to come in. Officer Kasper had the impression that Brown was just "a cooperative citizen that had found the computer equipment." Stevens informed Kasper privately of what had just occurred. Both officers then reentered the room, advised Brown of his rights, and asked if they could conduct a more thorough search. Brown was told that he had a right not to have the room searched. Brown signed a waiver form.

The computer equipment and television had recently been stolen. After he was indicted for theft by receiving in the second degree, Brown moved to suppress the evidence of the television and the computer equipment on the grounds that he was arrested without probable cause and that his room was illegally searched. Judge Moody denied the motion.

## THE SEIZURE OF BROWN

In *Howard v. State*, 664 P.2d 603, 608 (Alaska App.1983), we said:

There are essentially three types of contact between the police and private citizens which have received attention in the reported cases: (1) A generalized request for information, for example, ques-

tions put to bystanders during an on-the-scene investigation of a crime. (2) An investigatory stop, supported by articulable suspicion that a person has committed or is about to commit a crime. (3) Finally, an arrest, based upon facts and circumstances which would lead a prudent person to believe that a crime had been committed and that the person arrested had committed it.

. . . .

An inquiry of someone at the scene is not necessarily a fourth amendment seizure. An investigatory stop and an arrest are fourth amendment seizures. [Citations omitted.]

Brown argues that he was seized when Officer Stevens approached him and began asking questions. Alternatively, Brown contends that he was seized when he was asked for identification. The state argues that Stevens' investigation did not constitute an investigatory stop until he frisked Brown for weapons.

■ A person is seized when a reasonable person in his position would not feel free to leave. *Florida v. Royer,* 460 U.S. 491, ——, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983); *Waring v. State,* 670 P.2d 357, 364 (Alaska 1983). The question of when a seizure occurs is factual; a trial court's finding of fact should be overturned only if clearly erroneous. 670 P.2d at 364 n. 15. In this case Judge Moody did not specifically determine the point at which Brown was seized or whether he was seized at all prior to his arrest. Judge Moody did decide, however, that the questions initially put to Brown by Stevens and the request for identification did not constitute a seizure.

■ In *Waring,* the court expressly declined to decide whether a request for identification standing alone is a seizure. *Id.* at 364 n. 16. The court noted, however, that retention of a person's identification beyond the time necessary for a cursory check could be construed as evidence that a seizure had taken place. *Id.* at 364 n. 17. In *Waring,* the supreme court specifically rejected the contention that any contact between a uniformed police officer and a suspect was so apparently coercive that a seizure should be found. Rather the court concluded that the question is whether the officer's behavior was conduct which "a reasonable person 'would view as threatening or offensive even if coming from another private citizen.'" *Id.* at 364 (citing 3 W. LaFave, *Search & Seizure* § 9.2, at 53–54 (1978)). Officer Stevens asked Brown for identification in the course of general questioning about the television. Stevens had a right to be where he was and to ask questions about what was going on around him. *G.R. v. State,* 638 P.2d 191, 195 (Alaska App.1981), *rev'd on other grounds, Waring v. State,* 670 P.2d 357 (Alaska 1983). Under the totality of the circumstances, Judge Moody did not err in concluding that Brown was free to leave during the initial questioning. *Compare Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361 (1979) ("When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment.")

■ The state argues that when Officer Stevens began the pat-down search of Brown, Brown was seized for fourth amendment purposes. We agree. At that point, on-the-scene questioning had evolved into a full-blown investigatory stop. *See Howard v. State,* 664 P.2d at 608. Certainly, a search of Brown's person was a restraint that he was not free to ignore or to walk away from. It was also conduct which would be threatening if performed by a private citizen.

Brown argues that Stevens never had an articulable suspicion that Brown had committed or was about to commit a crime. Brown also contends that even if Stevens did have an articulable suspicion that a crime had been committed, it was not a crime involving imminent public danger or serious harm to persons or property. *See Coleman v. State,* 553 P.2d 40, 46 (Alaska

1976). We reject Brown's arguments based upon our reading of *Coleman.*

■ There are two steps to the *Coleman* test. First, the officer's suspicion must be reasonable:

[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.... And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

553 P.2d at 45 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). Second, the officer's reasonable suspicion must involve an imminent public danger or the recent infliction of serious harm to persons or property. *Id.* at 46. The state does not argue, nor does Stevens' testimony imply that Stevens perceived Brown as an imminent danger to the public. The state does argue, however, that Stevens reasonably suspected that Brown was either the perpetrator of a recent burglary involving the television, or that he had recently received a stolen television. The specific and articulable facts that Stevens could point to included his observation of Brown carrying a television in a hotel when each room had its own television and Brown could not provide a satisfactory explanation. In addition, Brown did not readily provide identification and he gave evasive answers regarding his name. These facts and the rational inferences they suggest meet the first prong of the *Coleman* test, and warranted an investigatory stop.

Officer Stevens suspected Brown of either burglary or receiving stolen goods. In *Hubert v. State,* 638 P.2d 677, 685–86 (Alaska App.1981), we said:

We need not decide whether investigations of receiving and concealing stolen property, in the abstract, would in all instances justify an investigative stop un-

der *Coleman's* requirement of serious harm to person or property. It is sufficient to note that, in this case, the stolen property that was sought had been taken in a recently perpetrated burglary. Despite the apprehension of the principals involved in the burglary, recovery of the goods stolen in the course of commission of that crime formed an integral part of the burglary investigation. We believe that the public in general and law enforcement officers in particular have a strong and vital interest in recovering property stolen in the course of a burglary within the period of time immediately following commission of the offense. It is manifest that, with passage of time, the fruits of a burglary will increasingly be likely to be transferred, separated and rendered inaccessible, substantially reducing the possibility of their recovery. Though it can accurately be said in this case that Hubert was suspected of receiving and concealing. stolen property and that he was not suspected as a principal in the burglary which had recently occurred, reliance on this fact to conclude that the police effort was not part of the burglary investigation would be both arbitrary and irrational. Here, the close nexus between Hubert's possession of stolen goods and the burglary from which those goods were derived, coupled with the recency of the burglary and transfer of the goods to Hubert, support the realistic conclusion that the investigative stop of Hubert on the morning of February 21, 1978, was an integral part of the burglary investigation. Thus, under the holdings of *Ozenna [v. State ]* [619 P.2d 477 (Alaska 1980) ] and *Free [v. State ]* [614 P.2d 1374 (Alaska 1980) ] the element of recent, serious harm to property, as required by *Coleman,* was sufficiently satisfied when Brandlen stopped Hubert and Dickenson.

■ We believe that *Hubert* requires us to reject Brown's claim that Stevens could not have had an articulable suspicion that a crime involving serious harm to property had been committed. While Stevens did

not know that a burglary had taken place, he had reasonable suspicion to believe that the television was stolen and that it was stolen in a burglary. Televisions do not lend themselves to shoplifting or other casual theft. A police officer could reasonably believe that any stolen television was taken during a burglary. We therefore conclude that Stevens had a reasonable suspicion that Brown had engaged in recent criminal conduct involving serious danger to property at the time the seizure took place.

■■■ This conclusion is not dispositive of Brown's argument, however, for as we noted in *Howard v. State*, 664 P.2d 603 (Alaska App.1983), the right to seize temporarily is not necessarily the right to search. Any use of force by a police officer must be reasonable under the circumstances and in light of the crimes being investigated. 664 P.2d at 609–10. Stevens suspected Brown of property theft. He did not know Brown and he had no particular reason to suspect that Brown was violent or armed. Nevertheless, under the circumstances of this case, we believe that a brief pat-down for weapons was reasonable. *See Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968).

■■■ In evaluating all of the circumstances we must bear in mind the two critical determinations required by *Terry:* whether the officer's action is justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference. *Terry v. Ohio*, 392 U.S. at 17–19, 88 S.Ct. at 1877–78, 20 L.Ed.2d at 903–05 (1968). *See* 3 W. LaFave, *Search & Seizure* § 9.4 at 115 (1978). Those cases applying federal law have permitted a frisk automatically when the officer has a reasonable suspicion that certain crimes have been committed.

Lower courts have been inclined to view the right to frisk as being "automatic" whenever the suspect has been stopped

upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed, whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved. This includes such suspected offenses as robbery, burglary, rape, assault with weapons, and dealing in large quantities of narcotics.

3 W. LaFave, *Search & Seizure* § 9.4 at 116 (footnotes omitted).

The Alaska rule articulated in *Coleman* for justifying an investigatory stop is, however, more restrictive than federal law. Temporary detention for questioning is allowed only if the officer suspects "that imminent public danger exists or serious harm to persons or property has recently occurred." *Coleman v. State*, 553 P.2d at 46. As we have seen, Stevens had a reasonable suspicion that Brown was involved in a burglary, a felony under Alaska law. *See* AS 11.46.300–.310. While burglary is not *per se* a crime of violence, it is a serious crime, and those convicted of burglary are subject to substantial sanctions. *See* AS 12.55.125(d), (e). Stevens might well fear that someone suspected of burglary would carry a weapon and resort to violence. We find that the frisk was permissible under the circumstances.[1]

### THE SEARCH OF ROOM 8

Judge Moody found that Brown voluntarily accompanied Officer Stevens back to room 8 and that Brown consented to Stevens' entry into the room. Judge Moody implicitly concluded that Brown understood that Stevens went to room 8 merely to ascertain whether Brown had a key to the room and that Stevens did not have a pre-

---

1. Our disposition of this issue makes it unnecessary to determine whether a valid investigatory stop permits a limited search for purposes of identifying the person stopped. *Compare State v. Flynn*, 92 Wis.2d 427, 285 N.W.2d 710, 718 (Wis.1979), *cert. denied*, 449 U.S. 846, 101 S.Ct.

130, 66 L.Ed.2d 55 (1980) (allowing such a search), *with People v. Williams*, 63 Mich.App. 398, 234 N.W.2d 541, 544 (Mich.App.1975) (precluding such a search). *See* 3 W. LaFave, *Search and Seizure* § 9.4(g) at 76–83 (Supp. 1984).

determined intent to search the room. Consequently, Judge Moody said:

Brown was free to terminate the conversation and leave the officer's presence, Brown could also have refused to accompany the officer to Room 8 or once there could have refused to open the door to the room. There is no testimony which would indicate that the officer requested that the defendant open the door or requested entry into the room. Brown voluntarily accompanied Officer Stevens to the room, removed the key, opened the door and entered the room with the officer behind him.

In addition, Judge Moody found that Brown voluntarily permitted Officer Kasper to enter the room after Stevens indicated that there was computer equipment in it. Finally, Judge Moody noted that the officers told Brown that he need not consent to a search and that after being given this information he executed a written consent to search.

▮ Brown had a reasonable expectation of privacy in his hotel room protected by the Fourth Amendment to the United States Constitution. *See Robinson v. State*, 578 P.2d 141, 142–43 (Alaska 1978). The police could not legally enter the room without a search warrant unless there was an applicable exception to the warrant requirement. Judge Moody found that Brown consented. If this finding is supported by substantial evidence, then the entry was consistent with the fourth amendment. In order to establish consent, the state must carry the burden of showing that Brown's consent was "unequivocal, specific and intelligently given, and not the product of duress or coercion." *Pierce v. State*, 627 P.2d 211, 216 (Alaska App.1981) (quoting *Phillips v. State*, 625 P.2d 816, 817 (Alaska 1980)). In assessing whether a consent was voluntary, all the surrounding circumstances must be considered. *Schneckloth v. Bustamonte*, 412 U.S. 218, 230, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854, 864 (1973). Since Judge Moody ruled in the state's favor, the evidence must be construed in the light most favorable to the state. *Gray v. State*, 596 P.2d 1154, 1158

n. 18 (Alaska 1979). A trial court could certainly find that being stopped, subjected to a pat-down search and commanded to "open your wallet" would intimidate a defendant to the point that any subsequent consent would be tainted. Similar findings in this case would have required suppression of the evidence found in room 8. Having reviewed the evidence, however, we cannot say that Judge Moody was clearly mistaken in reaching a contrary conclusion and denying the motion to suppress. Temporary custody, standing alone, does not invalidate a subsequent consent to a search. *See* 2 W. LaFave, *Search & Seizure* § 8.2(b) at 643. Brown was not arrested at gunpoint, handcuffed, or surrounded by police officers. He dealt with a single officer in what appears to have been a low-key conversation and then returned to room 8 with Officer Stevens. It is highly significant that Officer Stevens never claimed authority to enter room 8 nor did he specifically ask to enter the room. Instead, he merely followed Brown when Brown walked ahead of him through the door. At no time did Brown express any objection, either verbally or through nonverbal conduct, to Stevens' entry into the room. Brown was a mature man in apparent possession of his faculties. There is no suggestion that he is mentally or emotionally ill or that he was under the influence of alcohol or drugs. Under these circumstances, we affirm Judge Moody's finding that Brown consented to Stevens entering the room. *See Guidry v. State*, 671 P.2d 1277, 1280–82 (Alaska 1983); *Robinson v. State*, 578 P.2d 141, 144 (Alaska 1978). *Cf. Washington v. Chrisman*, 455 U.S. 1, 7, 102 S.Ct. 812, 817, 70 L.Ed.2d 778, 785–86 (1982) (it is not unreasonable for a police officer to accompany a lawfully arrested individual into his room for the purpose of obtaining identification). *See generally* 2 W. LaFave, *Search and Seizure* § 8.2 (1978).

The judgment of the superior court is AFFIRMED.

BRYNER, Chief Judge, dissenting.

I dissent.

The evidence in this case, when considered in the light most favorable to the state, indicates that Brown was stopped by Officer Stevens of the Anchorage Police Department because he was carrying a portable television in the hallway of his hotel. Brown was frisked for weapons and ordered to identify himself. The state concedes that Brown was reduced to custody at this point. After requiring Brown to produce identification, Officer Stevens questioned him about the location of his room and the manner in which he had paid for it. Brown was not advised of his rights. When Brown indicated that he was staying in room 8, he was told, "Well, let's go there." Brown complied. He unlocked the door to his room and was followed inside by Officer Stevens.

In order to justify Officer Stevens's warrantless entry of Brown's room, the state was required to prove, by a preponderance of the evidence, that Brown's consent was "unequivocal, specific and intelligently given, and not the product of duress or coercion." *Phillips v. State*, 625 P.2d 816, 817 (Alaska 1980); *Pierce v. State*, 627 P.2d 211, 216 (Alaska App.1981). Certainly, an individual's consent to a warrantless search need not be expressly given and may be inferred from the totality of the circumstances surrounding the search. Yet I see no circumstances from which an "unequivocal, specific and intelligent" consent may be inferred in this case.

The stop and frisk to which Brown was subjected was unquestionably custodial in nature. Almost immediately after being detained, frisked and ordered to produce identification from his wallet, Brown was told to go to his room. He complied with the order. There is nothing in the record to indicate that Brown could reasonably have believed that he was no longer under detention. Nor does the record support an inference that Brown was given a realistic choice when Officer Stevens told him to "go to room 8."

This court's obligation to construe the evidence in the light most favorable to the prevailing party should not serve as a basis for automatic approval of a trial judge's factual determinations. Here, the trial court's finding of a consent to search is unsupported by the evidence and is therefore clearly erroneous. The trial court's conclusion that Brown was free to disregard the command to "go to room 8" simply cannot be reconciled with the state's concession that Brown had been subjected to a custodial stop. On the factual record in this case, the majority's willingness to accept the trial court's findings seems to stand the consent requirement on its head. The majority's decision in effect holds that any person subjected by police to custodial detention must risk forfeiture of his fourth amendment rights if he does not resist or expressly object to potentially unlawful orders.