**Stephen Lee STAATS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–669.**

Court of Appeals of Alaska.

April 18, 1986.

Linda Wilson, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Michael S. McLaughlin, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Stephen Lee Staats appeals after a conviction of misconduct involving a controlled substance in the third degree (possession of cocaine with intent to deliver), in violation of AS 11.71.030(a)(1). Staats challenges the validity of the search that led to his arrest and contends that his sentence is excessive. We affirm.

On October 26, 1983, the Anchorage Westward Hilton mistakenly booked two parties into room 1053. Staats was the first party. The second party, a Northwest Airlines crewmember, entered the room and noticed Staats' belongings there. Because the room was normally assigned to members of Northwest Airlines flight crews, the crewmember believed the belongings were another crewmember's. In an attempt to find out who the other crewmember was, she opened a small red suitcase, which she found on the floor under the bed. Inside it, she discovered a substantial quantity of a white crystalline substance, which she believed might be contraband. She summoned another crewmember to look at the suitcase, who called the hotel management and reported the discovery.

Vincent Young, the chief of hotel security, responded to the call and met with the two crewmembers. The second crewmember explained what the first had found.

Young instructed the first crewmember to go down and get another room. Then, accompanied by the second crewmember, he proceeded to room 1053 and entered the room with a passkey. Once inside the room, the second crewmember reopened the suitcase and showed Young its contents. Young concluded that the suitcase contained drugs. He closed the suitcase, replaced it in its original position, and contacted the front desk to find out the status of the room. Personnel at the front desk determined that the room had been double-booked and informed Young. Young then called the police. The second crewmember apparently remained with Young to await the arrival of the police.

Anchorage Police Officer Patricia Buccilli was dispatched to the hotel and met Young outside room 1053. Young conducted Buccilli into the room and opened the suitcase to show her its contents.[1] Buccilli concluded that the suitcase probably contained contraband. Without conducting any further inspection, Buccilli called the Anchorage Police Department and requested that felony investigators be dispatched. Buccilli and Young awaited the investigators in the corridor outside room 1053.

A short time later, Anchorage Police Department investigators arrived. Young led them into the room and showed them the contents of the suitcase.[2] One of the officers conducted a field test that indicated the presence of cocaine. Young closed and replaced the suitcase, and the officers left the room without undertaking any further search. Two of the officers went to secure a search warrant for the room and for the hotel's registration records. The other officers stationed themselves in a vacant room across the hall from room 1053, where they maintained surveillance.

Soon after they had obtained a warrant, officers saw Staats enter room 1053. They knocked on his door and announced that they had a warrant. Receiving no reply, the officers entered with a passkey and found Staats in the room without the suitcase. The window of the room was open. The officers looked out and saw the suitcase on a roof five floors below. A search of the suitcase yielded twenty-seven heat-sealed clear plastic envelopes containing a total of 1,621 grams of cocaine.

Additional investigation disclosed that Staats was simultaneously registered at the Captain Cook Hotel. There, police found more than $28,000 in cash and Staats' round trip ticket from San Francisco to Anchorage.

Following arrest, Staats was charged with misconduct involving a controlled substance in the third degree. He moved to suppress the contents of the suitcase, arguing that the initial warrantless intrusions into room 1053 by Young, Buccilli, and police department investigators violated his rights under the fourth amendment of the United States Constitution and article I, §§ 14 and 22 of the Alaska Constitution. Superior Court Judge Victor D. Carlson

---

1. At a hearing on Staats' motion to suppress evidence, Buccilli testified that Young said little to her and that he conducted her into the room and opened the suitcase without being asked to do so. In contrast, Young's recollection was that, before he led Buccilli into the room, she told him she would have to see the suitcase.

   In reviewing the denial of a motion to suppress evidence, this court, in the absence of express findings of fact by the trial court, must view the evidence in the light most favorable to the prevailing party below. *Phillips v. State,* 625 P.2d 816, 817 n. 5 (Alaska 1980). Accordingly, the facts recited in the text are those which are most favorable to the state.

2. At the suppression hearing, Young's recollection was that he closed the red suitcase after showing its contents to Buccilli and that he closed the door to room 1053 after he and Buccilli left the room. Police Investigator James Ellis testified, however, that the door to the room was already open when the felony investigators arrived and that the suitcase was open and its contents in plain view when Young led the investigators into the room. In denying Staats' suppression motion, Judge Carlson appears to have resolved the conflict in favor of Ellis' testimony, concluding that Young had apparent authority to invite the officers into the already open room and that, once inside, the officers could see the contents of the suitcase in plain view. We note that Ellis' testimony is consistent with the testimony given by Investigator Leo Brandlin when applying for a warrant to search room 1053.

rejected Staats' motion, concluding that Young had apparent authority to admit the officers into room 1053 and that, once admitted, the officers could see the drugs in plain view.

After denial of his suppression motion, Staats entered a plea of no contest, reserving his right to appeal the trial court's decision on the issues he had raised. *See Cooksey v. State,* 524 P.2d 1251 (Alaska 1974). Upon conviction, Staats was sentenced by Superior Court Judge J. Justin Ripley to serve six years in prison, with two years suspended.

On appeal, Staats raises the same suppression issues that he raised below. He questions the validity of the warrantless search conducted by Young. He also questions the validity of the warrantless police entries into room 1053. Finally, he questions the validity of the warrantless inspections of the red suitcase by Officer Buccilli and, subsequently, by felony investigators. We will examine each of these issues in turn.

Staats' initial claim is that Young's warrantless entries into room 1053 and his inspections of the suitcase containing drugs were constitutionally prohibited. Although Staats recognizes that the constitutional prohibition against unreasonable searches and seizures governs only the actions of public officials and does not extend to private searches, *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), he nonetheless contends that Young's purpose in searching the suitcase and in contacting the police was essentially a governmental one: to enforce the law. Staats reasons that, given Young's prior employment as a police officer and his current status as a professional security guard, his conduct should be deemed subject to constitutional restraints.

We decline to accept Staats' view, which appears to be at odds with the sound weight of authority:

> The courts have not hesitated to admit into evidence under the *Burdeau* rule the fruits of illegal searches conducted by persons who, while not employed by the government, have as their responsibility the prevention and detection of criminal conduct. Included within this category are store detectives, security officers at amusement parks, insurance investigators, industrial security guards, and airline security agents.

W. LaFave, *Search and Seizure* § 1.6(d) at 126–27 (1978) (footnotes omitted).

Some courts have extended the restrictions of the fourth amendment to searches by private security officers who acted under color of law or otherwise asserted the power of the state. *See, e.g., People v. Zelinski,* 24 Cal.3d 357, 155 Cal.Rptr. 575, 594 P.2d 1000, 1005–06 (1979). Likewise, this court has recognized that the actions of a private security guard are subject to constitutional restraints if the guard is an agent or employee of a state agency, even though the guard's specific functions are not directly related to enforcement of the law. *See Lowry v. State,* 707 P.2d 280 (Alaska App.1985). On the other hand, where security guards have not been employees or agents of the state and their actions have not been undertaken under color of law, we have declined to find a predicate for application of constitutional limitations. *See Cullom v. State,* 673 P.2d 904 (Alaska App.1983). *See also Jackson v. State,* 657 P.2d 405 (Alaska App.1983) (discussing *People v. Zelinski* but declining to reach the issue of whether store security guards were subject to constitutional restrictions).

In the present case, we find no basis in the record for concluding that Young acted under color of law in entering room 1053 or in inspecting the contents of the suitcase containing drugs. Nor did he act under color of law when he first called the police. Young neither did nor purported to do anything that a private citizen would not be empowered to do under the law. His actions were, rather, undertaken in his capacity as a private employee of the hotel. They were in response to a specific request by a hotel guest who had found apparent contraband and reported it to the hotel management. Under these circumstances,

the hotel—and Young, as its employee—had an obvious and legitimate private interest in reporting the contraband to the police and in seeking its expeditious removal from the premises.

█ Staats nevertheless insists that the presence of police officers on the two occasions when Young reentered room 1053 and on the single occasion when he reopened the suitcase is sufficient to convert an otherwise private search into a police intrusion. We disagree. We find no basis for concluding that Young acted as an employee or agent of the state in his dealings with officer Buccilli and with the felony investigators who succeeded her. Young's past experience as a police officer and his duties as a security officer do not, alone, suffice to establish governmental participation in or instigation of his actions with respect to the suitcase. The record does not indicate that Young was ever hired or paid by the police, or that he was involved in a joint operation with them.

The general rule appears to be well settled that mere police presence during a private search conducted under circumstances similar to those of the present case does not amount to governmental participation or instigation, even when the private search itself is unauthorized or illegal:

> If ... police have been called to the scene and are thus present while a private person retrieves evidence of a crime which he had uncovered before contacting the police, and the private person's authority to make the search is not obviously nonexistent, courts do not appear to be concerned about the failure of the police to prevent the search.

W. LaFave, *Search and Seizure* § 1.6(b) at 117 (1978) (footnote omitted). The Alaska Supreme Court has clearly followed the general rule, holding that police presence during a private search does not amount to governmental participation. *See Sumdum v. State,* 612 P.2d 1018, 1020–21 (Alaska 1980).[3] In the present case, Young's authority to open the suitcase and disclose its contents to the police was far from "obviously nonexistent." *See Sumdum v. State,* 612 P.2d at 1021–22. *See also United States v. Bomengo,* 580 F.2d 173 (5th Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). We find that the presence of police officers did not amount to governmental participation in actions that Young undertook as a private citizen.

Staats next asserts that, even if Young is considered to have acted as a private person, he had no authority to allow police officers to enter room 1053. Staats thus contends that Buccilli's warrantless entry into the room and the similar subsequent entry by felony investigators were unjustified. In asserting this claim, Staats relies on *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), where the United States Supreme Court held that a hotel employee generally has no authority to consent to the search of a room occupied by a guest.[4]

The superior court, in denying Staats' motion to suppress, found that Young had apparent authority to consent to the police entry of room 1053. While this ruling may at first blush seem problematical in light of the holding in *Stoner,* we believe that, on closer examination, it is basically sound.

**3.** The Alaska Supreme Court's decision in *Sumdum* noted that the private search—in that case conducted by a motel employee—was apparently authorized because the deadline for checking out had passed and the employee was attempting to ascertain whether the defendant had vacated his room. Other courts, however, have expressed little difficulty in holding that police presence, standing alone, is not a sufficient basis for finding governmental participation, even where the private searcher's authority to inspect another person's property has been far more questionable. *See, e.g., United States v. Andrini,*

685 F.2d 1094 (9th Cir.1982); *United States v. Coleman,* 628 F.2d 961 (6th Cir.1980); *Bernovich v. State,* 272 So.2d 505 (Fla.1973); *People v. Clements,* 80 Ill.App.3d 821, 36 Ill.Dec. 63, 400 N.E.2d 483 (1980); *State v. Oldaker,* 304 S.E.2d 843 (W.Va.1983); *State v. Bembenek,* 111 Wis.2d 617, 331 N.W.2d 616 (1983).

**4.** The Alaska Supreme Court has applied *Stoner v. California* in *Finch v. State,* 592 P.2d 1196, 1197 n. 3 (Alaska 1979), and *Robinson v. State,* 578 P.2d 141, 142 (Alaska 1978).

In *Stoner*, police officers suspected the defendant of a recent robbery and had reason to believe that he was staying at a hotel. The officers went to the hotel and contacted the desk clerk, who told them that the defendant was a guest but that he was not then in his room. The officers asked the clerk for permission to enter the room, and the clerk admitted them. The subsequent search yielded evidence establishing the defendant's guilt. Under these circumstances, the court in *Stoner* invalidated the search, refusing "to permit an otherwise unlawful police search of a hotel room to rest upon consent of the hotel proprietor." *Stoner*, 376 U.S. at 489, 84 S.Ct. at 893, 11 L.Ed.2d at 860 (citations omitted).

By contrast, in the present case, Young, the hotel employee, was initially admitted to room 1053 by the second Northwest Airlines crewmember. Young was shown the contents of the suitcase, which appeared to be a large quantity of contraband, and was asked to resolve the situation. Without relinquishing control over the room or its contents, Young summoned the police, described the situation, and displayed the suspected contraband to them. The second crewmember apparently remained with Young when the police arrived and were admitted.

Under these circumstances, we conclude that Young's initial presence in room 1053 was consented to by a lawful occupant of that room.[5] *See Doyle v. State*, 633 P.2d 306 (Alaska App.1981). Moreover, it is reasonable under the circumstances to infer that the scope of the consent given to Young was commensurate with the purpose for which it was given. Young's actions in contacting the police, admitting

them into the room, and displaying the contents of the suitcase to them were foreseeable at the time he was contacted and the contraband was shown to him.

A similar factual setting was considered by the Alaska Supreme Court in *Phillips v. State*, 625 P.2d 816 (Alaska 1980). In *Phillips*, police responded to a report that a dead body had been found in a house. They were admitted into the house by Mike Yakasoff, one of the occupants. Upon entering, the officers observed a man's body. Their preliminary inspection indicated that the man had died of natural causes. After arranging to have the body removed, the officers exited the house. While waiting outside for removal of the body, one of the officers heard an occupant say, in connection with the body, that he thought he had seen a knife. The officer subsequently reentered the house a number of times to conduct additional investigation and a more extensive search. Ultimately, these efforts resulted in the murder charges against Phillips.

The Alaska Supreme Court found that reentry of the house by the police was justified by Mike Yakasoff's initial consent. The court concluded:

> Mike Yakasoff evidently consented to Little's [the officer's] initial entry in order to have the mystery of the dead body resolved. The subsequent entries and the investigative search were all made for the same purpose. While it might have been prudent for the police to have obtained a specific consent to each new intrusion, we cannot say that their failure to do so vitiated Mike Yakasoff's implied continuing consent.

*Phillips v. State*, 625 P.2d at 818.

Young's situation in the present case is comparable to that of the officer in *Phil-*

---

**5.** Staats has asserted no basis for drawing any legal distinction between the scope of authority possessed by the first crewmember to allow entry into room 1053 and the scope of authority possessed by the second crewmember to allow such entry. Nor, under the circumstances, do we see any point in attempting to draw such a distinction. As indicated in our recitation of the facts, the first crewmember was registered as a guest in room 1053 and initially discovered the contraband. She summoned the second

crewmember and showed him what she had discovered. The second crewmember, in turn, contacted hotel security. Although it was the second crewmember, not the first, who actually reported the contraband and accompanied Young into room 1053, the intervention of the second crewmember had specifically been requested by the first, and the second crewmember's actions were obviously undertaken at the behest of the first.

*lips.* Young was called and asked to deal with contraband that had been found in room 1053. He was admitted to the room, and the contraband was shown to him. It seems only reasonable to infer that both the first crewmember, who was a registered guest in the room and who initially discovered the contraband, and the second crewmember, who intervened at the first crewmember's behest, intended to authorize Young to remain in or reenter the room as necessary to accomplish the purpose for which he had been summoned. Young's initial entry and his two subsequent reentries into room 1053 were proximate in time and were effected without his ever having relinquished actual custody and control over the room. Both reentries fell squarely within the purpose for which Young had first been admitted. On these facts, we conclude that Young had continuing authority to be in room 1053 and that the scope of his authority was sufficiently broad to vest him with at least apparent authority to admit police officers to the room for purposes of removing the contraband that had been found therein.

The fact that Young was expressly authorized to enter room 1053 by a lawful occupant of that room and impliedly authorized to remain in or reenter the room readily distinguishes this case from the circumstances addressed in *Stoner v. California.* In *Stoner,* the challenged consent was given without even arguable consent or knowledge of any lawful occupant of the room. No basis existed for a finding of apparent authority in *Stoner,* because the police were aware the hotel clerk's consent was based only on the hotel's proprietary interest in its rooms, and the Supreme Court had previously made it clear that a

hotel proprietor has no general right to give such consent.[6]

The police officers in the present case, by contrast, did not go to the hotel seeking permission to conduct a search. Rather, they were summoned there by Young. The officers were informed that an occupant of the room had discovered apparent contraband and that Young had been called to deal with the situation. They knew that Young had already been admitted into the room and had observed the contraband. Thus, from the officers' point of view, Young's authority to enter the room and to allow their own entry could reasonably have appeared to derive not from the hotel's general proprietary interest, but, rather, from the fact that Young was acting on the complaint of a guest who had requested his presence in the room.

Admittedly, the present case is complicated by the unusual fact that room 1053 was double-booked. The presence of another guest was certainly not reasonably foreseeable by Staats. It cannot in any realistic sense be said that Staats consented to the entry of any other person into his room or that he otherwise did anything to relinquish his right to expect privacy in his room and in his belongings. Yet Staats does not challenge the first crewmember's status as a lawful occupant of room 1053. Nor does he contend that, as such, the first crewmember did not exercise at least apparent authority, acting through her companion, to admit Young to the room once she had discovered the contraband.

Staats does correctly note that, where a person's authority to consent to a police entry appears questionable, the police are under a duty to make reasonable inquiries before acting on that consent.[7] *See, e.g.,*

---

**6.** *See Stoner v. California,* 376 U.S. at 489, 84 S.Ct. at 893, 11 L.Ed.2d at 860 (citing *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), and *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951)).

**7.** In addition, Staats points out that, after being told of the discovery of apparent contraband, Young instructed the first crewmember to obtain another room for herself. Staats argues that any right the first crewmember might have

had to allow entry into room 1053 was relinquished at the point when she went to be issued a new room. We believe it would be unrealistic, however, to attribute any legal significance to Young's instruction, which was plainly no more than an effort to avoid unnecessary inconvenience to one of the hotel's guests. We find two factors to be particularly significant: first, Young instructed the crewmember to obtain another room only after he had already been summoned, informed of the circumstances, and

*Nix v. State,* 621 P.2d 1347, 1350 (Alaska 1981); *Robinson v. State,* 578 P.2d 141, 145 (Alaska 1978). In the present case, however, Young's authority to be in the room and to invite police entry reasonably appeared to stem from the consent of a lawful occupant of the room. The fact that the officers were apprised that the room was double-booked and that the contraband had apparently been left in the room by its initial occupant did little to vitiate Young's apparent authority. The question of whether one occupant of a double-booked hotel room possesses actual authority to consent to a police entry presents a difficult legal issue of first impression; it is a question upon which reasonable people could readily hold differing views. Under the circumstances, we find nothing unreasonable in the fact that the police apparent-

ly proceeded on the assumption that such authority did exist.

■ Although the situation is a close one, we believe the first crewmember must be regarded as being a lawful occupant, who had at least apparent authority to consent to Young's entry into room 1053 and to his subsequent admission of the police into the room for the limited purpose of dealing with the contraband discovered therein. Young, in turn, must be deemed to have had at least apparent authority to consent to entry by the police. *See generally Nix v. State,* 621 P.2d at 1349; *Schikora v. State,* 652 P.2d 473, 476–77 (Alaska App.1982).[8]

■ A separate question is raised concerning validity of the inspections by the

asked to deal with the contraband; second, it is clear from Young's testimony that no one was aware that room 1053 had been double-booked and that it was, in fact, occupied by a second registered guest until after Young's initial entry into the room and inspection of the contraband. Moreover, even assuming that assignment of a new room to the first crewmember vitiated that crewmember's right to consent to an entry of room 1053 by Young, we fail to see how that fact would cause any significant change in Young's apparent authority to invite police officers to enter the room for purposes of inspecting the contraband.

Staats further argues that any consent to Young's entry into room 1053 was limited to the original entry and that Young's subsequent entries into the room were nonconsensual. This argument is resolved by our finding that the original consent was sufficiently broad to allow reentry by Young and to confer upon him the apparent authority to summon the police to the room.

**8.** Even if we assumed that Young had no actual or apparent authority to allow the police to enter room 1053, it is questionable whether their entry of the room would constitute a warrantless search. We note that, in circumstances highly similar to those of the present case, other courts have upheld warrantless police entries. *See United States v. Roberts,* 644 F.2d 683 (8th Cir.1980) (en banc), *cert. denied,* 454 U.S. 973, 102 S.Ct. 523, 70 L.Ed.2d 392 (1981); *United States v. Bomengo,* 580 F.2d 173 (5th Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Lucas v. State,* 381 So.2d 140 (Miss.1980). These cases, like the present case, involve situations in which a private citizen undertakes a search of premises occupied by a

third party, discovers apparent contraband, and makes a prompt report to the police, who thereafter enter the premises at the private citizen's request and inspect the apparent contraband. The cases reason that, under such circumstances, even if the private citizen had no authority to consent to entry by the police, no separate or additional search occurs if the entry and inspection by the police do not exceed the scope of the initial private search.

In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the United States Supreme Court held that police did not engage in an additional or separate search when they opened and removed the contents of a package given to them by a private citizen, who had previously opened the package, discovered contraband therein, and resealed it. Although decided before *Jacobsen,* the rulings in *Roberts, Bomengo,* and *Lucas* appear to rely on a rationale similar to that subsequently adopted by the United States Supreme Court. Significantly, *Roberts, Bomengo,* and *Lucas* all involved warrantless intrusions into premises occupied by third parties, while *Jacobsen* dealt only with the inspection of a previously opened container. Application of the *Jacobsen* rationale by *Roberts, Bomengo,* and *Lucas* to the entry of premises has been characterized as questionable by at least one commentator. *See* W. LaFave, *Search and Seizure* § 1.6(b) at 73 n. 44 (1986 Supp.). Nevertheless, Staats has failed to cite any cases involving similar facts reaching a contrary result, and we have found none. In the present case, our finding that Young had apparent authority to admit the police into room 1053 makes it unnecessary for us to determine whether the reasoning of *Roberts, Bomengo,* and *Lucas* should be adopted under Alaska law.

police of the contents of the suitcase containing cocaine. Staats correctly notes that the crewmember who initially discovered the contraband had no authority to consent to a search of Staats' suitcase by either Young or the police and that Young, in turn, could not consent to such a search. Consent, however, need not be found to justify the police inspection of the contents of Staats' suitcase.

As we have already indicated, the search of Staats' suitcase by the stewardess and the inspection of the contraband by Young were private searches. Young's reopening of the suitcase for Officer Buccilli was at most a repetition by him of the initial private searches. No separate or additional search or seizure of the suitcase was undertaken by Buccilli, and Staats' expectation of privacy in the contents of his luggage was subjected to no significant incursion beyond that occasioned by the initial private searches. *See Stange v. State*, 559 P.2d 650 (Alaska 1977); *State v. Stump*, 547 P.2d 305 (Alaska 1976). *See also United States v. Bulgier*, 618 F.2d 472 (7th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 51 (1980); *United States v. McDaniel*, 574 F.2d 1224 (5th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979).

Similarly, no new or additional search occurred and no further violation of Staats' privacy interests resulted from the warrantless inspection by felony investigators of the suitcase containing drugs. The trial court's findings establish that the suitcase was already open and the drugs were in plain view when the investigators were led into room 1053 by Young. Moreover, it cannot persuasively be argued that the field tests conducted by the felony investigators were impermissible. While the field tests necessarily involved a limited search of the clear plastic envelopes containing drugs and seizure of a small portion of their contents, the search and seizure were justified because the contents of the plastic envelopes were in plain view and the police had ample reason to believe that what they saw was contraband. *See United States v. Jacobsen*, 466 U.S. 109, 122–26, 104 S.Ct. 1652, 1661–63, 80 L.Ed.2d 85, 100–02 (1984); *State v. Stump*, 547 P.2d at 307.[9] We hold that the warrantless police inspections of the contents of the red suitcase did not constitute impermissible searches or seizures.

In summary, we conclude that the actions of Vincent Young were those of a private citizen and were therefore not subject to constitutional restrictions. We further conclude that Young was authorized to remain in or reenter room 1053 in order to turn the apparent contraband over to the police and that, in inviting the police into the room for this purpose, he acted with at least apparent authority. Finally, we conclude that actions taken by the police in inspecting the contents of the suitcase

9. Although the Alaska Supreme Court's decision in *State v. Stump* predates the United States Supreme Court's decision in *Jacobsen* by approximately seven years, *Stump*'s holding with respect to the validity of warrantless field tests is substantially similar to that ultimately arrived at in *Jacobsen*. In *Stump*, an airline employee, Krossa, opened a package shipped by the defendant and inspected its contents, discovering apparent contraband. The ensuing facts were described in the supreme court's opinion as follows:

> [A]fter Krossa discovered the powder, he called the police. He then repackaged the goods in their original box with the end cut off. When Investigator Harter arrived, Krossa removed a t-shirt from the box and showed Harter the plastic bag containing the powder. Harter then took the bag and tested the powder. It reacted positively for cocaine.

*Stump*, 547 P.2d at 307 (footnotes omitted). In upholding the second inspection under these circumstances, the supreme court held:

> We are not persuaded that this inspection stands on any different footing than the first inspection. There is no indication it was done at the direction of the police, nor was there an attempt by the officer to open the original package. Investigator Harter was handed a t-shirt from a box opened by Krossa, and the powder contained in the plastic bags was pointed out to him. No police search had occurred up until this time. There was no "prying into hidden places for that which is concealed" by the officer, and thus the contraband was in plain view. Hence, the second inspection was permissible and the subsequent seizure justifiable.

*Stump*, 547 P.2d at 307–08 (footnotes omitted).

upon entering room 1053 did not, under the circumstances of this case, amount to new or additional searches or seizures. Accordingly, we hold that the superior court did not err in denying Staats' motion to suppress.

Staats additionally challenges as excessive his sentence of six years, with two years suspended. Misconduct involving a controlled substance in the second degree is a class B felony, punishable by a maximum term of ten years' imprisonment. The presumptive term for a second felony offender is four years. *See* AS 11.71.-030(c); AS 12.55.125(d). Staats, a first felony offender, thus received an unsuspended term of imprisonment equivalent to the presumptive term for a second felony offender.

Although this sentence is a severe one for a first offender, Staats' offense involved an unusually large quantity of cocaine and was obviously commercial in nature. Moreover, Staats was personally involved in transporting the cocaine to Alaska. While Staats claimed that he was merely acting as a courier, the sentencing court found this explanation to be implausible and rejected it. There is, accordingly, no basis here for concluding that Staats' involvement with the drugs in question was minimal or tangential. *Cf. Marin v. State*, 699 P.2d 886 (Alaska App.1985).

Having independently reviewed the entire sentencing record, we conclude that Staats' sentence is not clearly mistaken. *See Stuart v. State*, 698 P.2d 1218, 1224 (Alaska App.1985); *Lausterer v. State*, 693 P.2d 887, 892 (Alaska App.1985).

The conviction and sentence are AFFIRMED.