**Samuel K. CARTER, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8217.

Court of Appeals of Alaska.

July 3, 2003.

---

11. *Erickson,* 507 P.2d at 512.

Michael A. Stepovich, Fairbanks, for Appellant.

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

1.  AS 11.71.040(a).

*OPINION*

MANNHEIMER, Judge.

Samuel K. Carter was one of four occupants of a hotel room in Fairbanks. The police were interested in investigating the room because they suspected that drug activity was occurring there. The police obtained the hotel management's permission to search the room after Carter and the other occupants checked out (*i.e.*, after they vacated the room, and before the hotel's cleaning staff began to work on the room).

However, the police decided to speed up this process. The police knew that the hotel's check-out time was one o'clock p.m., so at one o'clock they ordered Carter to gather his belongings and leave the room. In the process of gathering his belongings, Carter opened a night stand drawer. When he did so, the police observed crack pipes and syringes in the drawer. Based on this discovery (and other evidence obtained in the ensuing investigation), Carter was convicted of fourth-degree controlled substance misconduct.[1]

We conclude that the police did not have the authority to remain in Carter's hotel room, nor did they have the authority to order Carter to gather his belongings and leave the hotel room. We therefore conclude that the evidence against Carter should have been suppressed, and that his conviction must be reversed.

*The evidence relating to Carter's tenancy in the hotel room and the authority granted to the police by the hotel management*

On January 9, 2001, Carter and three other people occupied a room at the Fairbanks Comfort Inn; the other occupants of the room were Pamela Fain, her adult daughter Amy Fain, and Amy's minor child.

The hotel room had initially been rented on January 5th for one night. However, the rental had been extended on a day-to-day basis, up to and including the night of January 8th. The established check-out time at the Comfort Inn was one o'clock in the after-

noon. Thus, the check-out time for Carter and the other occupants of the room was one o'clock on the afternoon of January 9th.

Carter was under police surveillance on the morning of January 9th. The police were investigating a report that Carter had threatened Amy Fain with a gun, and they were also aware that Carter had a history of using narcotics.

Investigator James O'Malley, a Fairbanks police officer assigned to the Statewide Drug Enforcement Unit, decided to contact the management of the Comfort Inn to seek permission to search Carter's room. O'Malley spoke to the front desk clerk, Judith Tonkovich, asking that he be allowed to search Carter's room after the occupants checked out, but before the housekeeping staff cleaned the room. Tonkovich told O'Malley that he could search the room after the occupants checked out. Tonkovich also informed O'Malley that the established check-out time was one o'clock.

O'Malley's conversation with Tonkovich took place around noon. To kill time until Carter and the other occupants checked out, O'Malley ate lunch and then he went to the Comfort Inn to renew his surveillance of the hotel and of Carter's vehicle (which was parked in back of the hotel). O'Malley's purpose was to see who came out of the hotel at check-out time, who drove away in Carter's vehicle, and what they might be carrying.

But at approximately 12:45 p.m., a new development occurred: several Alaska State Troopers arrived to take Amy Fain into custody on a citizen's arrest complaint. O'Malley and his surveillance partner decided to assist the troopers with this arrest.

The troopers and the officers entered the hotel room at about one o'clock. Following a struggle, Amy Fain was arrested and the troopers removed her from the hotel room. But Officer O'Malley and his partner decided not to leave with the troopers; instead, they remained in the hotel room.

Following Amy's arrest, Pamela Fain took Amy's child and left the room. Thus, of the original four occupants, only Carter remained.

According to the superior court's later findings of fact, it was now slightly past one o'clock. O'Malley ordered Carter to gather his belongings and leave the room. O'Malley later testified that he believed he had the authority to order Carter to leave because (a) the room was not rented in Carter's name, (b) no one had paid for another night, and (c) it was now past the hotel's check-out time of one o'clock.

While Carter was gathering his belongings, he opened a night stand. Inside the night stand drawer, O'Malley and his partner observed crack pipes and syringes in the night stand. This discovery led to the charge in the present case.

*The superior court's ruling that the police lawfully discovered this evidence under the "plain view" doctrine, and (alternatively) because Carter had no expectation of privacy in the room after one o'clock*

Following his indictment, Carter asked the superior court to suppress the evidence against him. He argued that the police had had no right to order him to gather his belongings and leave the room, and thus their observation of the crack pipes and syringes in the night stand drawer was the fruit of a Fourth Amendment violation.

Superior Court Judge Mary E. Greene denied Carter's suppression motion because she concluded that the discovery of the crack pipes and syringes had resulted from a "plain view" observation. But the judge's decision actually contains two alternative rationales for the seizure of the crack pipes and syringes.

First, Judge Greene found that the police officers lawfully observed this contraband when, after they ordered Carter to leave the room (so that they could begin searching it), Carter opened the night stand drawer. Thus, the contraband was in "plain view". To justify a seizure of evidence under the plain view doctrine, the police must make their observation from a place where they are entitled to be. Judge Greene found that the officers were authorized to remain in Carter's room, and to order Carter to vacate the room, because the management of the

hotel had consented to have the officers enter and search the room.

Judge Greene acknowledged that the police "[had] not [been] requested by the Comfort Inn to evict Mr. Carter". But she then offered an alternative rationale for the seizure of the crack pipes and syringes. She ruled that Carter had no right to occupy the room after one o'clock—*i.e.*, that Carter's expectation of privacy in the room expired at one o'clock—because (1) one o'clock was the Comfort Inn's established check-out time and (2) Carter had done nothing at that point to extend his occupancy of the hotel room (by, for example, informing the hotel management that he intended to stay for another night). She concluded that, because Carter had no expectation of privacy in the room after one o'clock, he could not complain that the officers forced him to gather his belongings and leave the room.

*A hotel guest's expectation of privacy in a hotel room*

■ The superior court's decision rests on two foundations, one factual and the other legal. The legal foundation of the superior court's decision is the court's ruling that, if check-out time passes without action on the part of a hotel guest to renew their tenancy, the hotel guest loses all expectation of privacy in their hotel room. This is not correct. The correct rule, as explained by our supreme court in *Sumdum v. State*, 612 P.2d 1018 (Alaska 1980), is that, depending on the factual circumstances and the hotel's own policies, the guest may suffer a diminution of their expectation of privacy in the room *as against the hotel management*.

In *Sumdum*, the defendant was staying in a hotel room that was registered in someone else's name. The police were interested in Sumdum because he had been identified as the suspect in a theft. The police contacted the hotel management at twelve-thirty in the afternoon. The hotel's check-out time was

eleven in the morning, and the desk clerk confirmed that neither the registered guest nor anyone else had paid for another night's lodging or had otherwise indicated an intent to extend their stay.[2]

The desk clerk later testified that whenever hotel guests failed to contact the management within an hour or so after the eleven o'clock check-out time, it was the clerk's responsibility to ascertain (1) whether the guests had absconded without paying for the room or, if not, (2) whether the guests intended to extend their stay or (instead) vacate the room.[3] To conduct this inquiry, the clerk would first telephone the room. If the guests did not answer the phone, the clerk would go to the room and attempt to make contact by knocking on the door. If the clerk was still unsuccessful in making contact with the guests, the clerk would then enter the room to investigate the situation.[4]

In *Sumdum's* case, the desk clerk followed the hotel's standard procedure. Because it was twelve-thirty (*i.e.*, an hour and a half after the normal check-out time), she telephoned the room. After receiving no answer, she walked to the room and knocked on the door.[5] Still receiving no response, the desk clerk went back to her office, retrieved the hotel management's key to the room, and then opened the room. The police were at her side in the corridor. When the desk clerk opened the door, the police saw incriminating evidence (fruits of the theft) in plain view.[6]

The supreme court recognized that the legality of the officers' discovery of this incriminating evidence turned on whether the officers validly obtained their view of the interior of the room.[7] The court acknowledged that "[a] guest in a motel has a constitutionally protected right [of] privacy in [their] room"; thus, in normal circumstances, "motel personnel cannot consent to a search of the guest's room".[8] However, the guest's

2.  *Sumdum*, 612 P.2d at 1020.

3.  *Id.* at 1021, 1022 n. 6.

4.  *Id.* at 1020.

5.  *Id.*

6.  *Id.*

7.  *Id.* at 1021.

8.  *Id.*

expectation of privacy changes when the rental period has ended. The court explained that

> after the rental period has terminated, a guest's reasonable expectations of privacy are greatly diminished *with respect to the right of [the] motel management to enter [the room].*

*Sumdum,* 612 P.2d at 1021 (emphasis added).

The supreme court concluded that, because the desk clerk entered Sumdum's room under circumstances when she normally would have done so, and in accordance with the motel's customary procedures, her entry was lawful. The supreme court further concluded that the lawfulness of the desk clerk's entry into the room "was not altered by the presence of the police".[9]

However, in an accompanying footnote, the supreme court clarified that the right to enter the room upon the termination of the guest's tenancy belongs to the hotel management, not the police, and that any such entry must normally conform to the practices of the hotel management. The court cautioned that, in future cases, "[i]f the police presence results in actions *that would not normally have occurred within the time frame in question,* [we] will look carefully at the circumstances to determine whether [the alleged] independent private purposes [for the entry] are merely a sham for warrantless police searches".[10]

This insistence on honoring the standard practices of the hotel is simply another facet of the rule that the supreme court stated earlier in its opinion: a guest who fails to meet the check-out deadline set by the hotel does not lose all expectation of privacy in the room; rather, the guest suffers a diminution

of their expectation of privacy with respect to the right of the *hotel management* to enter the room.

This same rule is consistently followed by the federal courts that have addressed this issue. Although these courts sometimes phrase the rule in terms of the guest losing all expectation of privacy after check-out time expires without renewal of the tenancy, these federal cases uniformly involve entries by hotel management or entries by police officers at the express authorization of hotel management. That is, non-renewal of the tenancy does not subject hotel guests to warrantless entries and searches by the police; rather, depending on the circumstances, non-renewal may subject guests to entries and searches by hotel management.[11]

As the *Sumdum* decision suggests, the extent to which a hotel guest's expectation of privacy is diminished will vary according to the particular circumstances of the case and the customary practices of the hotel. The Fourth Circuit expressly acknowledged this same rule in *United States v. Kitchens,* 114 F.3d 29, 32 (4th Cir.1997): "[a motel] guest may still have a legitimate expectation of privacy even after his rental period has terminated, if there is a pattern or practice which would make that expectation reasonable".

Professor Wayne R. LaFave discusses this feature of Fourth Amendment law in his treatise on the law of search and seizure. Professor LaFave agrees that when a guest misses the hotel's check-out deadline, the guest's rights—*i.e.,* the extent of the guest's continued expectation of privacy in the room—will depend, in large measure, on the hotel management's customary practices and the circumstances of the tenant's relationship

**9.** *Id.*

**10.** *Id.* at 1022 n. 7 (emphasis added).

**11.** *See United States v. Kitchens,* 114 F.3d 29, 30, 31–32 (4th Cir.1997) (upholding the right of the *manager* to authorize the police to enter a motel room when more than an hour had passed since the established check-out time and the guests had not extended their tenancy); *United States v. Allen,* 106 F.3d 695, 697, 699 (6th Cir.1997) (upholding the right of the *manager* to enter a motel room under similar circumstances); *United States v. Huffhines,* 967 F.2d 314, 316, 318

(9th Cir.1992) (holding that a guest has no reasonable expectation of privacy in their room *against motel management* after the rental period has expired); *United States v. Rahme,* 813 F.2d 31, 33, 35 (2nd Cir.1987) (same); *United States v. Larson,* 760 F.2d 852, 854, 855 (8th Cir.1985) (same); *United States v. Parizo,* 514 F.2d 52, 54 (2nd Cir.1975) (upholding the right of the *manager* to enter a motel room when the defendant rented the room for a single night, paid only for one night, and never informed the management that he wished to stay longer).

with the hotel management. Thus, "no abandonment [of the premises] will be deemed to have occurred[,] even after the initially indicated term of [occupancy has expired, if, for example,] the tenant had arranged for credit card payment of all charges and both the motel [management] and the tenant treated the tenant's non-departure as extending the term [of occupancy]." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 2.3(a), Vol. 1, p. 471.

Professor LaFave's statement of the law is borne out by the cases. For example, in *United States v. Owens,* 782 F.2d 146, 150 (10th Cir.1986), and in *United States v. Watson,* 783 F.Supp. 258, 263 (E.D.Va.1992), the courts held that hotel guests retained a legitimate expectation of privacy in their rooms even though the established check-out time had elapsed because the hotel management had acquiesced in the guests' pattern of paying their bills after the check-out time.

Thus, under our supreme court's decision in *Sumdum* and the corroborating authorities discussed above, Carter's expectation of privacy in the hotel room did not come to an abrupt end at one o'clock in the afternoon. In particular, Carter continued to have a right of privacy *vis-a-vis* the police. If the police had any authority to remain in Carter's room and order him to vacate the room, that authority had to be derived from the express consent of the hotel management.

Because the one o'clock check-out time had passed, Carter's expectation of privacy *vis-a-vis* the hotel management was conceivably diminished. But, as the supreme court held in *Sumdum,* the extent of that diminution hinged on the customary practices of the Comfort Inn and Carter's interaction with the hotel management.

We now examine the evidence on these issues.

*Carter's expectation of privacy as against the management of the Comfort Inn, and the scope of the permission given to the police by the management of the Comfort Inn*

At the suppression hearing, Comfort Inn desk clerk Judith Tonkovich described the Comfort Inn's customary practices regarding its one o'clock check-out time, and she also testified to her conversations with Carter about his continued tenancy as a hotel guest.

Tonkovich told the superior court that, even though the Comfort Inn's established check-out time is one o'clock, the hotel's guests often remain away from their rooms past that time, not realizing that the scheduled check-out is one o'clock. For this reason, especially if the hotel is scheduled to be full that night, the hotel management will call guests to remind them of the check-out time, and to ask if they intend to check out on time or if they are planning to extend their stay.

Tonkovich also told the superior court that it was not uncommon for hotel guests to contact the desk clerk after one o'clock and indicate that they wished to stay at the hotel for another night. The hotel apparently acquiesced in this practice. In particular, Tonkovich expressly declared that she had not authorized Officer O'Malley and his partner to force Carter to vacate the room at one o'clock.

Tonkovich conceded that O'Malley contacted her and asked her when the occupants of Carter's room were due to leave. In answer to O'Malley's question, Tonkovich told him that the occupants of the room were *due* out at one o'clock but she also told him that she did not know their plans. Tonkovich told O'Malley that she "[would] call and see if they [were] staying over, or whatever".

Tonkovich did in fact call the room. She spoke to a man who identified himself as "Sam"—*i.e.,* apparently Carter. When Tonkovich asked "Sam" whether the occupants of the room would be checking out that day, he told her that "they would let [her] know". Tonkovich relayed this information to her supervisor, the hotel manager. She told the manager that she had not heard a definite answer from the occupants of the room, and that "they might be staying over".

Based on this testimony (which was undisputed), it was not the Comfort Inn's customary practice to immediately assert its right of possession against guests who missed the one o'clock check-out time. To the contrary: Tonkovich's testimony suggests that the

Comfort Inn routinely granted guests a certain amount of leeway when the check-out time was missed.

Moreover, leaving aside the Comfort Inn's general approach to the one o'clock check-out time, Tonkovich's conversation with Carter showed that she specifically granted leeway to the occupants of Carter's room. When Carter told Tonkovich that he and his friends would let her know later whether they intended to extend their stay at the hotel, Tonkovich did not object to his answer, nor did she set a deadline for Carter's decision.

In sum, based both on the customary practices of the Comfort Inn and on Carter's own conversation with Tonkovich (a representative of the hotel management), Carter continued to have a reasonable expectation of privacy in the hotel room after one o'clock.

Because Carter retained a reasonable expectation of privacy in the room, the police had no authority to remain in Carter's hotel room after the arrest of Amy Fain that brought them there, and they had no authority to force Carter to gather his belongings and vacate the room. This would have been true even if Tonkovich had purported to authorize the officers' actions. But, as the evidence shows, she did not authorize the officers' actions.

■ As already noted, Tonkovich expressly testified that she did *not* authorize the officers to evict Carter from the hotel room at one o'clock. And Tonkovich's testimony on this point is consistent with Officer O'Malley's testimony. O'Malley did not assert that Tonkovich authorized him to force Carter from the room at one o'clock. Rather, O'Malley testified that when he contacted Tonkovich, he asked her for permission to search Carter's hotel room after the occupants *checked out*—that is, after the hotel management had regained its right of possession, and before the cleaning staff went to work on the room.

When Judge Greene denied Carter's suppression motion, she found that the management of the Comfort Inn consented to have

the police officers "search [Carter's room] after the guests were no longer entitled to be there"—by which the judge meant that the hotel management authorized the police to search the room at one o'clock if no one had explicitly arranged for another day's tenancy. This finding is clearly erroneous.[12]

The evidence shows that Tonkovich authorized the police to search the hotel room after Carter and the other guests *checked out—i.e.,* after they voluntarily vacated the room. Tonkovich did not authorize the police to evict Carter from the room at one o'clock, nor did she authorize the police to search the room at the stroke of one if the occupants of the room failed to expressly arrange for an extension of their tenancy.

Judge Greene further found that Carter "did not have to open anything; he did not have to pack up anything"—apparently suggesting that when the police officers saw the crack pipes and the syringes in the night stand drawer, this was because Carter voluntarily displayed or gathered up these items in a manner that allowed them to be seen by the officers. Again, this finding is clearly erroneous.

■ After the state troopers completed their arrest of Amy Fain, O'Malley and his partner remained unlawfully in Carter's hotel room, and they unlawfully ordered Carter to gather his possessions and vacate the room. Because of the officers' illegal order, Carter was faced with the choice of either (1) leaving his possessions behind while the officers prepared to unlawfully search his room or, alternatively, (2) gathering up his possessions under the scrutiny of the officers—a scrutiny that was not legally authorized, since the officers were entitled neither to remain in Carter's room nor to order him to leave.

Under these circumstances, Carter did not voluntarily expose his possessions to the officers' scrutiny. The officers' observation of the crack pipes and syringes was the fruit of their unlawful presence in the room and their unlawful demand that Carter vacate the room. The superior court should have grant-

12. A finding is "clearly erroneous" if it "leaves the [reviewing court] with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding". *Geczy v. LaChappelle,* 636 P.2d 604, 606 n. 6 (Alaska 1981).

ed Carter's motion to suppress this evidence and its fruits.

### Conclusion

To sum up: As a factual matter, the hotel management did not give the police the authority to enter Carter's room and remove him from the premises at one o'clock. Moreover, even if the hotel management had purported to consent to these police actions, the hotel management would have exceeded its own authority—because, based on the hotel's customary practices regarding check-out, and based on Carter's earlier conversation with the desk clerk, Carter retained a reasonable expectation of privacy in the room even after one o'clock.

It is true that the officers had independent authority to enter the room to assist the state troopers in arresting Amy Fain. But once this task was completed, the police had no authority to remain in the room, and they had no authority to order Carter to gather his belongings and vacate the room.

Thus, the police officers' observation of the crack pipes and syringes can not be justified under the doctrine of plain view. Rather, the officers' observation of this contraband was the fruit of their illegal actions.

The judgement of the superior court is REVERSED.